**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                      )
**DIETRA BOWERS,**                    )
            **Plaintiff,**            )
                                      )
      **v.**                          )          **CIVIL ACTION**
                                      )          **No. 11-40229-TSH**
**CAROLYN W. COLVIN,**[1]             )
**Acting Commissioner of the**        )
**Social Security Administration,**   )
            **Defendant.**            )
_____)


**REPORT AND RECOMMENDATION**
**GRANTING DEFENDANT'S MOTION TO AFFIRM**

**March 12, 2014**

Hennessy, M.J.

By Order of Reference (Docket #21), pursuant to 28 U.S.C. § 636(b)(1)(B), this matter

was referred to me for a Report and Recommendation on Plaintiff Dietra Bowers' ("Bowers")

Motion for Remand (Docket #11) and Defendant Commissioner of the Social Security

Administration's ("Commissioner") Motion to Affirm (Docket #16).  This Court also considers

Bowers' Reply (Docket #18) and the Commissioner's Sur-Reply (Docket #19).  The record is

complete and the cross-motions stand ready for decision.[2]  The fundamental issue raised by

Bowers is whether the factual findings by the Administrative Law Judge ("ALJ") adequately

address her claim that her mood disorder prevents her from <u>sustaining</u> work activity.  For the

_____

[1]   Under Fed. R. Civ. P. 25(d), as of February 14, 2013, Carolyn W. Colvin is substituted for
Michael J. Astrue, the former Commissioner of the Social Security Administration.

[2]   A transcript of the Social Security Administration official record (<i>"<u>Tr.</u>"</i>) has been filed with
the court at Docket Entry #14.

reasons that follow, I recommend that Bowers' motion be denied and the Commissioner's motion be allowed.

## BACKGROUND

Bowers alleges a disability from mental impairment beginning April 14, 2008.  She was eighteen years old at that time and sought disability insurance benefits ("DIB") as a disabled child[3] and disabled worker, and supplemental security income benefits ("SSI").[4]  (Tr. 7, 27).  The Administrative Law Judge ("ALJ") held a hearing on both applications on April 1, 2011, in Worcester, MA.[5]  Bowers, her attorney, and a vocational expert attended the hearing.  (Tr. 29, 49).  On June 3, 2011, the ALJ notified Bowers that her claims for disability insurance benefits and supplemental security income were denied.  (Tr. 4, 24).  The next month, on July 8, 2011, the ALJ notified Bowers that he also had denied her claim for survivors' disability benefits.

---

[3]  Bowers' father died when she was a child.  To be entitled to claim child's insurance benefits after the age of 18, Bowers was required to allege a disability that began before she reached the age of 22.  20 C.F.R. 404.350(a)(5).  Bowers' claim as alleged met the eligibility requirements of the regulation.

[4]  The parties also refer to DIB as Social Security Disability Insurance ("SSDI").  DIB and SSDI are synonymous with each other; however, DIB and SSDI are not to be confused with Social Security Insurance ("SSI").  The legal standards applied to SSI and DIB/SSDI are the same, but separate, parallel statutes and regulations exist for SSI and DIB/SSDI claims.  Citations in this Report and Recommendation should be considered to refer to the appropriate parallel provision as context dictates.  The same applies to citations of statutes or regulations found in quoted court decisions.

[5]  For all individuals applying for disability benefits under title II (here, for Bowers, for both survivors' benefits and as a disabled worker), and for adults applying under title XVI (for disabled individuals who have limited income as Bowers claimed), the definition of disability is the same. The law defines disability as the inability to engage in any substantial gainful activity (SGA) by reason of any medically determinable physical or mental impairment(s) which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.  42 U.S.C. § 423(d)(1)(A).

(Id.).[6]  The ALJ's decisions became final on October 18, 2011 when the Appeals Council denied

Bowers request to review the same.  (Tr. 1).  Having timely pursued and exhausted her

administrative remedies before the Commissioner, Bowers filed a complaint in this court.

Bowers filed the Motion to Remand on March 21, 2012, and the Commissioner filed a Motion

for Order Affirming Decision of Commissioner on May 7, 2012.

### A.  Personal, Educational, and Occupational History

Bowers was born on January 24, 1990.  (Tr. 4, 24, 161, 169).  With the help of an

individualized educational plan ("IEP") and attendance in a specialized school, she graduated

high school at age twenty.  (Tr. 53, 63-64).  For a short time, she worked between 20-28 hours a

week as a telemarketer.  (Tr. 54-55, 185-86).  She was fired three times in these few months of

employment.  (Id.)  Bowers had such limited work history, the Commissioner did not even

consider it as past relevant employment.  (Tr. 18, 38).  Bowers claims she became disabled on

April 14, 2008, due to bipolar disorder and depression.  (Tr. 169, 184).

### B.  Medical History

Bowers makes no claims for physical disability.  Bowers' only claims stem from her

mental health status.  Pertinent treatment and evaluations are summarized below.

#### 1.  Prescott Health Care

On February 29, 2008, six weeks before Bowers claims her disability started, nurse Julie

Hurley prepared a medical summary regarding Bowers' visit to Prescott Health Care.  (Tr. 259-

63).  Bowers self-reported that she had been diagnosed with bipolar disorder at age 13 and that

she had mood swings, a decreased need to sleep, loss of energy, anxious mood, and an inability

to focus.  (Tr. 259).  The notes reflect that Bowers was well-groomed, slow-moving, and

---

[6] The ALJ's second decision was identical to the June decision in all respects except it addressed
Bowers' application for adult child's disability benefits.  (Tr. 4-19).

guarded, with a flattened affect.  She was alert and oriented, but her memory was impaired and

intelligence was described as below normal.  (Tr. 262).  Bowers was withdrawn, difficult to

engage, a poor historian, and a heavy user of marijuana.  (Id.).  In the summary, which was

reviewed by Dr. Anthony Tobacco ("co-signature only"), nurse Hurley ruled-out bipolar disorder

and scored Bowers with a Global Assessment of Functioning ("GAF") at 58.[7]  (Tr. 262-63).  The

nurse developed a treatment plan, including medications, that would raise her GAF score to

greater than 75.  (Tr. 263).  The ALJ assigned "persuasive weight" to the opinions expressed in

this summary, although the ALJ noted that Doctor Tobacco rendered his opinion before Bowers'

alleged onset date.  (Tr. 12, 32).

### 2.  Arbour Counseling Services

On June 9, 2008, a pregnant Bowers presented to Arbour Counseling Services for an

emergency intervention.  (Tr. 266-69).  Bowers reported abuse by her boyfriend, her own anger

issues, and being depressed with bipolar disorder.  (Id.).  An intern performed the intake and a

social worker co-signed the form.  (Tr. 269).  Bowers admitted having a history of drinking

alcohol and smoking marijuana, to past sexual abuse by a family member, and having no friends.

(Tr. 267-69).  Bowers reported that she lived at home, went to school, and worked as a

telemarketer.  (Id.).  The intern noted that Bowers seemed depressed with an anxious mood and

affect.  She further noted that Bowers had inadequate impulse control, fair insight, but poor

---

[7]  "The GAF scale is used to report a clinician's judgment of an individual's overall level of
psychological, social, and occupational functioning and refers to the level of functioning at the
time of evaluations."  Bernier v. Astrue, 2011 WL 1832516 (D. Mass. 2011).  GAF scores
between 41-50 indicate serious impairment in social, occupational, or school functioning; scores
51-60 indicate moderate impairment; and scores between 61 and 70 indicate mild symptoms.
See American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th
ed., text rev. 2000).

judgment.  (Id.).  The intern noted Bowers' clear speech and logical thought patterns.  She diagnosed Bowers with "bipolar I disorder (most recent episode depressed)" and scored Bowers' GAF at 60.  (Tr. 269).  The treatment plan focused on Bowers' angry outbursts, her lack of parenting skills, and depression.  (Tr. 270).  Because the ALJ found this opinion to be "consistent with the record as a whole," he accorded "significant weight" to it.  (Tr. 13, 33).

Bowers received further treatment from Abour Counseling on July 24, 2008 when George Hardman, M.D., performed a psychiatric evaluation of her.  (Tr. 272-73).  Bowers told him that she was off her medication, and had lost her job because she had "said something to (her) manager and he did not like (her) attitude."  (Tr. 272).  Bowers reported being argumentative, moody, depressed, and having trouble sleeping.  (Id.).  On examination, Dr. Hardman noted that Bowers was alert and oriented, did not have suicidal or homicidal ideations, and had fair judgment and insight.  (Id.).  He noted that her flow of speech was unremarkable with no loose association, that her memory was intact, and that she had no hallucinations or delusions.  (Id.).  He opined that she would be a candidate for mood stabilizer medication, but for her pregnancy.  (Tr. 273).  Instead, he recommended she take Benadryl to help with sleep.  (Id.).  He diagnosed her with bipolar disorder, depressed, and scored her GAF at 50.  (Tr. 272).  The ALJ accorded this opinion only "some weight" because it was "inconsistent with other records on [sic] evidence, including an evaluation performed at Arbour Counseling Services one and a half months prior."  (Tr. 13, 33).  It appears that Bowers had a follow-up appointment in September and one more in December 2008.  (Tr. 274-75).

### 3.  UMass Memorial Medical Center

Seven months later, on July 28, 2009, Bowers presented to UMass Memorial Medical Center for a women's anger management intake interview.  (Tr. 317-19).  On intake, Bowers told

a licensed social worker that her anger stemmed from her court case involving an altercation. (Tr. 317).  She reported having been arrested four times.  (Id.).  She also reported that she had stopped drinking alcohol three years prior, had stopped using marijuana in February 2009, and had used cocaine years prior.  (Id.).  She was in school at the time, but living in a shelter with her infant son.  (Id.).  She indicated she had never received inpatient psychiatric treatment; however, she noted that previously she had been treated at Arbour Counseling and had been prescribed Depakote, Celexa, sleeping pills, Trileptal, and Prozac.  (Tr. 318).  She reported not taking the medications at that time, denied having hallucinations and suicidal intentions, although, she reported that she felt sad, had mood swings, and a history of panic attacks.  (Id.).  On examination, Bowers' affect was "bright" and eye contact was good.  Her cognition was intact and her insight and judgment were good.  (Id.).  She was given a diagnosis of "rule out" anxiety disorder and scored with a GAF of 55.  (Id.).  She was scheduled to attend twenty weeks of anger management group therapy.  (Id.).  The ALJ accorded "significant weight" to this opinion from the treating source at UMass Memorial because it was consistent with the record.  (Tr. 13, 33). The record reflects that Bowers attended and participated in group anger management sessions at UMass from October 2009 through June 2010. (Tr. 309-316).

### 4.  Valley Psychiatric Services

Bowers began treatment at Valley Psychiatric Services in April 2010.  Bowers underwent an initial examination with Advanced Practice Registered Nurse ("APRN") Kim Gage.  (Tr. 333).  The examination revealed that Bowers was oriented, with normal behavior, speech, and thought content; but, she was anxious and reported seeing a person walk on her bedroom wall and hearing voices.  (Id.)  Her chief complaint was that she was depressed and "bipolar," which caused her to flip out.  (Tr. 333).  Bowers was prescribed Abilify, Klonopin, and Trazodone.

(Id.).  Bowers returned on June 23, 2010 for an appointment with APRN Gage who noted that Bowers appeared oriented, with normal behavior, speech and thought process.  (Tr. 332).  She reported that Bowers seemed sad and anxious, but was not taking her medication.  (Id.).  And she noted that Bowers self-reported that she felt like she couldn't "control herself" and was worried she might hurt her kids.  (Id.).  That same day, on June 23, 2010, APRN Gage and Licensed Mental Health Counselor ("LMHC") Janice Lovejoy completed a psychiatric disorder form regarding Bowers, wherein they opined she had a diagnosis of bipolar disorder and dysthymic disorder.  (Tr. 322-24).  They observed she was a "bright and studious woman who was impatient and had negative thinking."  (Tr. 322).  The nurse and therapist opined that Bowers functioned well, could pay her bills, care for her two children, prepare meals, clean her home, attend school, ride a bus, and perform community service.  (Id.).  But, they also noted that Bowers could be disorganized and neglected appointments.  (Tr. 323).  Socially, they determined that she could get along with teachers and her therapist, but had difficulty with large groups of people and her peers.  (Id.).  They thought her prognosis was "good" if she could control her temper and attend community college.  (Tr. 324).  Ultimately, they scored Bowers' GAF at 50. (Tr. 322).  The ALJ determined that only "some weight" should be accorded this opinion, primarily because the nurse and therapist were not considered acceptable medical sources within the regulatory definition (20 CFR §§ 404.1513 and 416.913), and because their finding that she had serious symptoms was inconsistent with the longitudinal record as a whole and with their own observations of Bowers.  (Tr. 15, 35)

During an August 2, 2010 session, therapist Lovejoy recommended that Bowers look to the future and pursue job opportunities and college plans. (Tr. 352).  Two weeks later, Bowers again met with therapist Lovejoy.  (Tr. 351).  Bowers presented with rational and logical

thoughts and reported no hallucinations.  (Id.).  She mentioned not using medications for the last

two days.  (Id.).  Bowers reported that she thought Abilify worked well to treat her anger, but not

her depression. (Id.).  Therapist Lovejoy encouraged Bowers to eat better, take her children to

the park, and practice some relaxation techniques.  (Id.).  Licensed Mental Health Counselor

Sheila Ranciane saw Bowers soon thereafter, and opined that Bowers had a diagnosis of bipolar

disorder, depression, and borderline personality disorder.  (Tr. 342).  She noted that Bowers

complained about being "trapped with her two children," and that Bowers "continue[d] to lack

motivation and was extremely lethargic."  (Id.).  The therapist recommended that Bowers should

find a hobby; Bowers agreed and promised to not sleep as much during the day.  (Id.).  By a

target date set by therapist Rancaine of March 1, 2011, it was hoped that "client will be able to

take control of her daily necessities," and pursue part-time employment and school.  (Id.).

In November 2010, Bowers met with therapist Lovejoy and self-reported that she had

difficulties "getting out of bed daily."  (Tr. 347).  The therapist and Bowers discussed the

possibility of finding "Christmas work" and returning to school in January 2011.  (Id.).  Notes

from a December 6, 2010 session with therapist Lovejoy indicate that Bowers' depression was

likely caused by her negative self-esteem and inactivity. (Tr. 345).  Later that month, on

December 22, 2010, Bowers met with nurse Gage who noted that Bowers appeared normal with

a rational and logical thought process, but had a flat and restricted affect.  (Tr. 339).  Bowers

reported suffering from insomnia, and had suspended use of her medication because she did not

find it helpful.  Bowers stated that she was "losing (her) mind," and her therapist suggested she

take Seroquel for anger.  (Id.).  The nurse advised Bowers to resume taking her medication.

(Id.).  At a January 3, 2011 appointment with therapist Lovejoy, Bowers reported she was

depressed and anxious, and not taking her medications.  (Tr. 344).  The therapist recommended

that Bowers call the police and get a restraining order on her son's father.  (Id.).  The therapist also recommended various places where Bowers could live and indicated that the therapist would contact the Department of Children and Families regarding Bowers' situation.  (Id.).  Two days later, Bowers met with therapist Lovejoy to form a plan for Bowers' protection from her "boyfriend's aggressive behavior."  (Tr. 343).  They discussed Bowers' fear of losing her children and her boyfriend's financial support if she disclosed his aggressive behaviors.  (Id.).  The plan was for the therapist to "give support to [Bowers] and help her become stronger in her decision making."  (Id.).  There are no subsequent reports from Valley Psychiatric Services.

### 5.  South Bay Mental Health Center

In January 2011, Bowers moved into a shelter for victims of domestic violence.  The shelter referred her to South Bay Mental Health Center.  (Tr. 364-73).  On January 26, 2011, Bowers met with therapist Donna DeAscentis who conducted a comprehensive assessment on Bowers.  The assessment record reflects that Bowers was not employed, and did not want to work, but instead wanted help learning to appropriately express her anger and her needs.  (Tr. 365 -373).  Bowers reported that her prior mental health treatment had been helpful, and she reported no side effects from medications.  (Tr. 367).  Ms. DeAscentis diagnosed Bowers with mood disorder, not otherwise specified, and scored her GAF at 50.  (Tr. 372).

On February 9, 2011, therapist DeAscentis crafted a four-month individualized action plan to address Bowers' goals of improving her communication skills, setting proper boundaries, and managing her anger.  (Tr. 374-81).  On March 2, 2011, Bowers met again with therapist DeAscentis who scored Bowers' GAF at 50.  (Tr. 355).  The therapist noted the following: intermediate memory impairment and disturbance in mood, incoherence, loosening of associations, illogical thinking, blunt affect, and emotional withdrawal and/or isolation.  (Tr.

356).  The therapist did not note bipolar syndrome.  (Id.) .  The therapist found, among other things, that Bowers had a "poor" ability to comprehend and follow instructions; she had a "fair" ability to perform complex and repetitive tasks, or work requiring frequent contact with others; and a "good" ability to perform simple tasks.  (Id.).  Ultimately, therapist DeAscentis opined that Bowers could achieve moderate improvement depending on her motivation and commitment. (Id.).  The ALJ accorded only "some weight" to Ms. DeAscentis' opinion because she was a therapist, thus not an acceptable medical source, and because her opinion was based on Bowers' subjective complaints.  (Tr. 36).

### 6.  Charlton Memorial Hospital

On March 18, 2011, Bowers was admitted to the emergency room after she threatened to kill herself at the shelter when her children were taken from her.  (Tr. 36, 384-388).  After a determination that Bowers would not harm herself or others, she was discharged with a diagnosis of being depressed and was referred to counseling.  (Tr. 384-85).

### C.  Opinion Evidence

The Massachusetts Department of Developmental Services referred Bowers to David Nowell, Ph.D., for a consultative examination.  On April 1, 2010, he reviewed her medical records, including the February 2008 intake summary from Prescott Health Center, the June 2008 intake from Arbour Conseling Services, and the July 2008 psychiatric evaluation by Dr. Hardman.  (Tr. 282-88).  He also reviewed the function report Bowers completed in connection with her application for disability.  (Id.).  He evaluated Bowers, noting she complained of bipolar disorder and depression, and that she was waiting to receive treatment from a psychiatrist, and was not taking medication.  (Tr. 283).  Bowers denied a history of alcohol or drug problems, and reported that she was unemployed and lived in an apartment with her two children.  (Id.).  She

said that she used public transportation, went grocery shopping, and had just finished high school two weeks earlier in a program for young parents.  (Tr. 283-84).  She stated that she was an honor student, but had been put on an IEP due to her anger and mood instability.  She said she had difficulty staying in the classroom with other students.  Bowers also mentioned she saw cups spinning, and sometimes saw faces and heard a man's voice – all of which Dr. Nowell attributed to her closeness with her grandmother whose cultural beliefs included the spirits and the paranormal.  (Tr. 283-85).  Dr. Nowell's mental status examination determined that Bowers was functioning in the average range of general ability, was candid, and was earnest with good insight.  (Tr. 284).  He noted she was "weepy" at times.  (Id.).  Bowers completed a patient health questionnaire and circled the most extreme response to all nine answers.  (Id.).  However, Dr. Nowell found this was not likely a valid report of her "true" mood status, but suggested that she saw herself as quite impaired.  (Id.).  Her full-scale IQ score of 90 put her in the low average/average range, and her WRAT-3 test[8] was within the average range.  (Tr. 285).  Dr. Nowell diagnosed Bowers with mood disorder, not otherwise specified, and adjustment disorder with mixed features.  (Tr. 286).  He scored her GAF at 68, and noted that Bowers' capacity for learning was good, her capacity for stress management was fair, and her social skills appeared adequate.  (Id.).  The ALJ gave Dr. Nowell's opinion "great weight" because he found it was "supported by the findings on examination and is generally consistent with the objective medical evidence of record."  (Tr. 14, 34).

On April 8, 2010, the state agency psychological consultant Celeste Derecho performed a non-examining assessment of Bowers.  (Tr. 289-306).  Dr. Derecho reviewed documents both

---

[8]   A WRAT-3 Test is a Wide Range Achievement Test 3, which measures the development of reading, spelling and arithmetic skills.  See Gary S. Wilkenson, The Wide Range Achievement Test, Third Edition (1993).

inside and outside the record and completed a psychiatric review technique form.  (Id.).  She

opined Bowers was mildly limited with activities of daily living; moderately limited with social

functioning, concentration, persistence or pace; and had zero episodes of decompensation.  (Id.).

Functionally, she opined that Bowers:

A.  Can understand and remember simple or detailed instructions.

B.  Can focus on a simple or detailed task over a two-hour time frame.  Can work in
proximity to others in a setting that does not require frequent communication.  Is not
described as paranoid or agoraphobic, but can be irritable at times.  Can make simple
decisions.  Does not require special supervision.  Has variability in energy level and
mood that could reduce pace at times but is not described as having incapacitating
vegetative symptoms of depression or full symptom manic episodes or any history of inpt
psych tx [sic].  Does not have psychiatric symptoms that would prevent adequate pace
and attendance at a full time job.

C.  Would not be able to interact with the public because of mood variability and irritable
behavior.  (Bowers) could respond adequately to simple directions and instructions from
a supervisor in the context of a routine job.  Would not be expected to engage in
behavioral extremes with coworkers.  Would not be expected to distract coworkers.
Expected to be able to maintain appropriate neatness and cleanliness.

D.  Would be expected to have adequate adjustment to most minor changes.  No limitations
on travel.  Not described as having impaired judgment.  Described as the primary care-
taker for 2 infants.  Can respond adequately to hazards.  Able to set realistic goals or
make plans independently.

(Tr. 306).  Dr. Derecho further opined that the evidence did not establish the presence of the "C"

criteria.[9]  (Tr. 301).    The ALJ gave "great weight" to this opinion because it was "consistent

with the record as a whole."  (Tr. 17, 37).

Four months later, on August 6, 2010, state consultant psychiatrist "B. Rudnick" affirmed

the April 2010 findings of Dr. Derecho.  (Tr. 336).  Dr. Rudnick indicated that he reviewed

Bowers' appeal report, including a psychiatric disorder form from Valley Psychiatric Services

---

[9]  The "C" criteria are met when the record reflects at least two years of a chronic affective
disorder that has caused "more than a minimal limitation of the ability to do any basic work
activity, with symptoms or signs currently attenuated by medication or psychosocial support"
and one of several symptoms listed in the code.  20 C.F.R. § 404, subpt. P, app. 1 at § 12.04C.

that noted her worsening symptoms.  (Id.).  Nonetheless, Dr. Rudnick concurred with Dr.

Derecho's prior opinion.  (Tr. 337).  The ALJ gave "great weight" to this opinion because it was

"consistent with the record as a whole."  (Tr. 17, 37).

Bowers' mother, Brenda Bowers, completed a Third Party Function Report on December

17, 2009.  While noting her daughters' inability to complete tasks and understand, Mrs. Bowers

reported that her daughter was capable of caring for her children, preparing meals, cleaning,

washing, using public transportation and shopping.  (Tr. 31).  This report was part of the record

and was relied upon by the ALJ.  (Tr. 37).

Dr. Amy Vercillo testified as a vocational expert ("VE") at the April 1, 2011 hearing.  As

a threshold matter, the ALJ asked Dr. Vercillo to assume that Bowers had no past relevant work

experience.  He then asked Dr. Vercillo to identify jobs for individuals who were limited to

unskilled tasks and who could tolerate only minimal interaction with the general public and co-

workers.  (Tr. 69).  Dr. Vercillo testified "there would be a wide variety of positions" in clerical

support or manufacturing, such as bench assembly, packer and sorter, collator, packer inspector

and labeler.  (Tr. 70).  Dr. Vercillo noted that if the individual had "marked limitations in the

abilities to maintain concentration, persistence, and pace," then she would not be able to perform

simple, unskilled work on a regular basis.  (Tr. 70-71).  Lastly, Dr. Vercillo testified that more

than one absence a month would not be tolerated in the unskilled job market.  (Tr. 71).

### D.  **ALJ's Findings and Decision**

For Bowers to qualify for benefits under title II (disability insurance benefits) and title

XVI (supplemental security income), the definition of disability is the same.  Bowers must show

that she is "disabled," or unable "to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  The determination whether someone meets this definition requires consideration of the following, ordered inquiries:  (1) whether the applicant is engaged in substantial gainful work activity; if not, (2)  if the applicant has a severe impairment or combination of impairments; if so, (3)  whether the impairment meets or equals the conditions for one of the "listed" impairments in the Social Security regulations, 20 C.F.R. § 404, subpart P, Appendix 1; if not, (4)  if the applicant's "residual functional capacity" is such that she can still perform her past relevant work; and, if not (5) whether the applicant, given her residual functional capacity, education, work experience, and age, is able to do any other work.  20 C.F.R. § 404.1520(a)(4); Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001).  It is the applicant's burden to show at Step 4 that she is not able to do past relevant work as the result of a "significant limitation;" if the claimant meets his/her burden, "the Commissioner then has the burden at Step 5 of coming forward with evidence of specific jobs in the national economy that the applicant can still perform." Seavey, 276 F.3d at 5; see also, 20 C.F.R. § 404.1560; 42 U.S.C. 423(d)(5)(A) ("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the (ALJ) may require."). It should also be noted that "(a)ll five steps are not applied to every applicant, as the determination may be concluded at any step along the process." Seavey, 276 F.3d at 5.  If those five steps are met, the application is granted.

The ALJ denied Bowers' claims on June 3, 2011 and July 8, 2011.  (Tr. 4, 24).  In so doing, the ALJ followed the five-step analysis outlined in 20 C.F.R. § 404.1520.  (Tr. 29-39). With regard to Step 1, he found Bowers had not engaged in substantial gainful activity since the alleged onset date of April 14, 2008.  (Tr. 29).  He found at Step 2 that Bowers suffered from a

severe impairment, i.e., a mood disorder.  (Tr. 29-30).  At Step 3, the ALJ determined that

Bowers did not have an impairment or combination of impairments that meets or medically

equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App. 1, 12.04.  (Tr. 30-

31).  He explained that "the overall record" led him to find Bowers had some restrictions, but

that her mental impairment did not cause limitations such as would be necessary to meet the

"paragraph B" criteria.  (Tr. 30).  Because "paragraph B" criteria were not satisfied, the ALJ

went on to explore whether Bowers had set forth facts satisfying "paragraph C" criteria; he

determined she had not, citing a lack of evidence to meet the standard set out in 20 C.F.R. Part

404, Subpart P, App. 12.00A ("The determination of mental RFC is crucial to the evaluation to

do SGA when your impairment(s) does not meet or equal the criteria of the listings, but is

nevertheless severe.").  (Id.).  Because Bowers did not meet a listing for a disability, the ALJ

then determined her residual functional capacity ("RFC"), that is, Bowers' ability to do physical

and mental work activities on a sustained basis despite limitations from her mood disorder.  20

CFR §§ 404.1545 and 416.920(e).  He found:

> After careful consideration of the entire record, the undersigned finds that
> the claimant has the residual functional capacity to perform a full range of
> work at all exertional levels but with the following nonexertional
> limitations:  She would be limited to unskilled tasks.  She would require
> only minimal interaction with the general public.  She would require only
> minimal contact/interaction with coworkers.

(Tr. 31).  He accorded "great weight" to  the April 1, 2010 opinion of Dr. Nowell, including Dr.

Nowell's score of Bowers' GAF at 68, as it was "supported by the findings on examination and

(was) generally consistent with the objective medical evidence." (Tr. 34).  The ALJ also gave

"great weight" to the April 8, 2010 opinion by psychological consultant Derecho because it was

consistent "with the record as a whole."  (Tr. 37).  The ALJ accorded "significant weight" to the

June 9, 2008 medical notes from a treating source at Arbour Counseling, including a GAF score

of 60, because they were "consistent with the record as a whole," (Tr. 33); and, the July 28, 2009 medical notes from a treating source at UMass Memorial Medical Center, including a GAF score of 55, as they were "consistent with the record." (Tr. 33). Finally, the ALJ gave "some weight" to:  the July 24, 2008 evaluation by Dr. Hardman at Arbour Conseling, including a GAF scored at 50, because the opinion was "inconsistent with other records on [sic] evidence, including an evaluation performed at Arbour Counseling Services one and a half months prior," (Tr. 33); the June 23, 2010 form from Valley Psychiatric Services, including a GAF scored at 50, because "the licensed social worker and advanced practice nurse [were] not considered acceptable medical sources" and their opinion that Bowers had serious symptoms was "inconsistent with the longitudinal record as a whole and their own observations" of Bowers, (Tr. 35); and, the March 2, 2011 notes from a therapist from South Bay Mental Health, including a GAF score of 50, because the therapist was not an acceptable medical source and her opinion was based largely on Bowers' subjective complaints.  (Tr. 36).

The ALJ reported that Bowers' "statements concerning the intensity, persistence and limiting effects of (her) symptoms (we)re not credible" as against his assessment of the evidence in the record of her RFC.  (Tr. 32).  The ALJ noted "several inconsistencies between [Bowers'] subjective report of symptoms, and the objective findings on physical examination."  (Tr. 38). He then made the Step 4 finding that Bowers has no past relevant work. (Id.).  Based on Bowers' age, education, work experience and RFC, and the testimony of the vocation expert, at Step 5 he found that there were jobs that exist in significant numbers in the national economy that Bowers can perform.  (Tr. 38-39).  Accordingly, the ALJ concluded that Bowers was not disabled under the Social Security Act.  (Tr. 39).

16

### E. <u>Bowers' Objections</u>

Bowers disputes the ALJ's fact findings underlying the ALJ's determination of no disability.  Bowers alleges: (1) the ALJ erred in assessing her abilities; (2) the ALJ inadequately assessed her "paragraph C" criteria; and, (3) the vocational evidence is flawed because it is based on a presumption that Bowers can sustain an eight-hour workday, and she claims she cannot.

### <u>DISCUSSION</u>

Pursuant to the Social Security Act, this Court may affirm, modify or reverse the Commissioner's final decision, with or without remanding the case for rehearing.  42 U.S.C. § 405(g).  While the court's review of questions of law is <u>de novo</u>, the court's role in reviewing a decision of the Commissioner is circumscribed:  it must defer to the Commissioner's findings of fact, so long as they are supported by substantial evidence.  <u>Seavey</u>, 276 F.3d at 9-10; <u>Reyes Roble v. Finch</u>, 409 F.2d 84, 86 (1st Cir. 1969) ("And as to the scope of court review, 'substantial evidence' is a stringent limitation.").  Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion."  <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>see also</u> <u>Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991) (even if administrative record could support multiple conclusions, a court must uphold Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion.").

In applying the "substantial evidence" standard, the court must bear in mind that it is the province of the ALJ, not the court, to find facts, decide issues of credibility, draw inferences from the record, and resolve conflicts in the evidence.  <u>Ortiz</u>, 955 F.2d at 769.  Ultimately, the court may affirm, modify, or reverse the Commission's decision, with or without remanding the

cause for a rehearing, 42 U.S.C § 405(g),[10] but reversal is warranted only if the ALJ committed a legal or factual error in evaluating a claim or if the record contains no "evidence rationally adequate…. to justify the conclusion." Roman-Roman v. Comm'r of Soc. Sec., 114 Fed. App'x. 410 (1st Cir. 2004); see also Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15 (1st Cir. 1996).  Keeping the standard in mind, each of Bowers' objections is addressed below.

    1.   The ALJ's Assessment of Bowers' Abilities

Bowers' principal challenge to the ALJ's decision is that his findings reflect that she is able to function, when she claims she is not.  Bowers bears the burden of proving disability, including the burden of establishing the scope of her RFC, and the Commissioner bears the burden of coming forward with evidence of specific jobs in the economy that Bowers can perform.  Seavey, 276 F.3d at 5.  Bowers claims that she carried her burden and the ALJ erred in his fact-finding.

First, Bowers alleges that the ALJ was required, but failed, to find that she had the RFC to "sustain work on a regular and continuing basis over the long-term."  20 C.F.R. § 404.1545(c) (emphasis added) (the Commissioner will "first assess the nature and extent of [a claimant's] mental limitations and restrictions and then determine [a claimant's] residual functional capacity for work on a regular and continuing basis.").  A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.  SSR 96-8p, 61 Fed. Reg. 34473, 1996 WL 374184, (July 2, 1996).  In contrast, the Commissioner contends the ALJ's findings regarding Bowers' RFC support a finding that she can sustain work.

---

[10]  "The (district) court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive ...."  42 U.S.C. § 405(g).

Residual Functional Capacity is a measurement of the most an applicant can do despite her limitations. See 20 C.F.R. § 404.1545(a). According to the Social Security Administration,

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing basis' means 8 hours a day, for 5 days a week, or an equivalent work schedule.

Social Security Regulation (SSR) 96-8p. In light of SSR 96-8p, a finding regarding RFC implicitly contains a finding that a claimant is able to sustain work for an eight hour day, five days a week. Moreover, ordinarily the ALJ determines a claimant's RFC only after he considers all relevant evidence of a claimant's impairments and any related symptoms. See 20 C.F.R. § 404.1529(a). Thus, an RFC finding implicitly addresses a claimant's specific limitations and abilities to sustain work, given those limitations. That is the case here. The ALJ found:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: She would be limited to unskilled tasks. She would require only minimal interaction with the general public. She would require only minimal contact/interaction with coworkers.

(Tr. 31). Thus, his finding expressly reflects the fact that he considered "the entire record." And, this is borne out by the record. Among other things, in support of his RFC finding, the ALJ accorded "great weight" to Dr. Nowell's opinion that Bowers' capacity for learning was good, her capacity for stress management was fair, and her social skills appeared adequate. (Tr. 33, 37, 304-07, 337). The ALJ also accorded "great weight" to Dr. Derecho's opinion that Bowers could understand and remember simple, detailed instructions, focus on a simple or detailed task over a two-hour frame, respond adequately to most minor change, and keep an adequate pace and attendance at a full-time job. (Id.). The ALJ found that Bowers' "statements concerning the intensity, persistence and limiting effects of (her) symptoms (we)re not credible" as against his

assessment of the evidence in the record of her RFC.  (Tr. 32).  The ALJ noted "several

inconsistencies between (Bowers') subjective report of symptoms, and the objective findings on

physical examination."  (Tr. 36, 38).  The ALJ did not credit Bowers' testimony that she was

unable to sustain work, based on her daily activities (Tr. 37).  For example, the ALJ noted that

Bowers testified that she performed household chores, prepared meals, used public

transportation, and managed her finances.  (Tr. 37, 199-200).  Lastly, the ALJ noted that Bowers'

own treating sources encouraged her to look for work, attend school, and find a hobby.  (Tr. 37,

349-52).

 The ALJ's finding further expressly reflects Bowers' limitations by finding that Bowers'

RFC must be tailored to unskilled work with minimal interaction with the public and coworkers,

e.g., "She would be limited to unskilled tasks.  She would require only minimal interaction with

the general public.  She would require only minimal contact/interaction with coworkers."  (Tr.

31).  Lastly, there was no requirement that the ALJ expressly find that Bowers could "sustain" a

forty-hour work week.  Hines v. Barnhart, 453 F.3d 559, 563 (4th Cir. 2006) (RFC implicitly

contains a finding that claimant can work on a regular and continuing basis); Perkul v. Barnhart,

153 Fed. App'x. 329, 332 (5th Cir. 2005) (ALJ's determination that claimant could perform

sedentary work is a determination that the claimant "is able to sustain work-related activities on a

'regular and continuing basis,' meaning '8 hours a day for 5 days a week.'").  Even putting this

aside, there is simply no evidence that the ALJ ignored or failed to understand that an RFC, by

its very definition, contemplates sustained work or activity.  Despite this, Bowers mounts a

number of challenges to the ALJ's findings.

 First, Bowers concedes that even though she has had periods when she performed

adequately, in her view, the overall record suggests that she has had great difficulty sustaining

anything, whether at school, at work, or in therapeutic settings.  In this regard, she compares herself to the claimant in Bauer v. Astrue, 532 F.3d 606, 608-09 (7th Cir. 2008).  However, Bauer is distinguishable.  There, the Court of Appeals for the Seventh Circuit determined that the claimant was disabled where she had an established diagnosis of bipolar disorder and treatment, and medical records reflecting years of regular treatment by a psychiatrist and a psychologist. Id., 532 F.3d  at 607.  Here, the credible evidence from acceptable medical sources reflects a diagnosis of mood disorder as opposed to a confirmed diagnosis of bipolar disorder, and the ALJ was within his authority to make such a finding.  Indeed, no acceptable medical source diagnosed Bowers with bipolar disorder.  There is simply no legal support, in Bauer or elsewhere, to justify a remand to the ALJ to more fully develop Bowers' ability to sustain work in light of her mood disorder.  This Court finds substantial evidence supports the ALJ's determination regarding Bowers' RFC to sustain employment.

Second, Bowers argues that her true abilities are not reflected in the ALJ's findings because he allegedly "cherrypicked" the highest GAF scores and that he ignored the lower scores reflecting lower functioning.  This was error, she claims, because the GAF scores are mere snapshots of Bowers at different times:  sometimes she was effectively functioning, while at other times she was not.  In addition, Bowers claims that her GAF scores worsened over time, but the ALJ's approach in assessing greater weight to her earlier GAF scores resulted in a skewed picture of her.  The record does not support this argument.  To the contrary, the record reports each of Bowers' GAF scores, ranging from a low 50 to a high of 68. (Tr. 272, 322, 355, 372).[11]  As to these, the ALJ acknowledged each GAF, gave it some measure of weight and then

---

[11]   Bowers takes issue with the ALJ including the opinion of Dr. Tobacco because it was rendered before the alleged onset date.  Any reference to the opinion is harmless as the ALJ twice acknowledged that the evidence predated the claimed disability (Tr. 32).

explained why he accorded the GAF score the weight that he did.  For instance, the ALJ gave

only "some weight" to the GAFs with a score of 50 because they were scored by medical sources

that are not acceptable under the regulations, and/or because they were mostly based on Bowers'

subjective assessments, and inconsistent with objective assessments, such as observations that

she was bright and studious, functioned well, and could execute many functions.  (Tr. 33-36).  It

was reasonable for the ALJ to discount these GAF scores.  See Rodriguez-Pagan v. Sec'y of

Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987) (where ALJ rejected treating sources'

opinion that had been based on the claimant's subjective complaints).  With respect to the higher

GAF scores, the ALJ accorded "great weight" to a GAF score of 68, explaining that Dr.

Nowell's opinion was "supported by the findings on examination and [was] generally consistent

with the objective medical evidence of record."  (Tr. 34).  Likewise, Bowers received a GAF

score of 55 that was accorded "significant weight" because it was consistent with the record

showing that she was bright and had good eye contact, despite feelings of sadness and mood

swings.  (Tr. 33).  Contrary to Bowers' challenge, the ALJ's decision to assign particular weight

to conflicting evidence is squarely within the discretion that is entrusted to the ALJ and is

therefore not entitled to de novo review.  Ortiz, 955 F.2d at 769; see also, 20 C.F.R. §

404.1527(c) (ALJs are explicitly permitted to give evidence from treatment sources less than

controlling weight where they find that the evidence is not well supported by the medical record

and/or is not consistent with the medical record.).  The ALJ's findings are supported by

substantial evidence.

Third, Bowers claims that the ALJ erred because Bowers' impairment worsened and the

ALJ failed to update the medical records before the hearing.  She points to medical records and

evidence that she claims show greater impairment "toward the end of 2009, and especially

during 2010, and after." (Docket #12, pp. 17-19).  Among other things, she points to the removal

of her children by the Department of Children and Families.  There are a number of problems

with this claim.  Bowers concedes, as she must, that the evidence of her impairment worsening is

mixed.  The state intervention with Bowers' children happened due to Bowers' reporting her

boyfriend's aggressive behavior (Tr. 364, 339, 343, 384-85); not because of Bowers' allegedly

deteriorating impairment.  Indeed, the only evidence supporting her contention that her children

were taken away from her as a result of her claimed impairment is Bowers' self-serving

testimony at the hearing.  (Tr. 58).  The ALJ was entitled to discredit her testimony in light of the

documented evidence.  See Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195

(1st Cir. 1987) (particular deference is due to the ALJ's findings of credibility).  Further, Bowers

cites to records by therapist Lovejoy of Valley Psychiatric Services and DeAscentis from South

Bay Mental Health who scored her GAF at 50 during this time.  (Tr. 56, 355-82).  Neither

woman is an "acceptable medical source," and the ALJ was entitled to accord less weight to their

opinions.  See 20 C.F.R. § 404.1513(a); SSR 06-03p ("The fact that a medical opinion is from an

'acceptable medical source' is a factor that may justify giving that opinion greater weight than an

opinion from a medical source who is not an 'acceptable medical source.'").  In the time since

Dr. Nowell (an acceptable medical source who provided expert opinion) examined Bowers, there

was no "material change" to the record warranting another expert medical report.  See Jones v.

Astrue, 2010 WL 2326263 (D.R.I. 2010).

In sum, the factual findings reflected in the record, including the RFC, contradict

Bowers' subjective claims of disability, and instead support the ALJ's finding that Bowers can

sustain employment.  See Teixeira v. Astrue, 755 F. Supp. 2d 340, 347 (D. Mass. 2010)

(affirming an ALJ's finding that claimant could work despite claimant's subjective belief that

she could not "participate effectively in the workforce"); <u>Wells v. Barnhart</u>, 267 F. Supp. 2d 138,

146 (D. Mass. 2003) (affirming an ALJ's findings about claimant's residual functional capacity

even though he did it "in a way that put the most positive spin on them.").  There is no reason to

set aside the ALJ's RFC determination regarding Bowers.

    2.  <u>The ALJ Adequately Addressed the "Paragraph C" Criteria</u>

Based on the ALJ's finding that Bowers suffered from an impairment, <u>i.e.</u>, "mood

disorder," he was required to determine whether her impairment was severe so that it met either

the "paragraph B" or "paragraph C" requirements.  20 C.F.R. § 404, subpart P, Appendix 1, Rule

12.04.[12]  The ALJ explained she met neither.  Bowers takes issue with his paragraph "C" finding,

arguing the ALJ made boilerplate conclusions when he should have analyzed the detrimental

effect she suffered when faced with demands in the workplace, from school, and with raising

children.  Bowers claims that as the demands increased, so did her lapses in functioning.

The "C" criteria are met when the record reflects at least two years of a chronic affective

disorder that has caused "more than a minimal limitation of the ability to do any basic work

activity, with symptoms or signs currently attenuated by medication or psychosocial support"

and one of several symptoms listed in the code.  20 C.F.R. § 404, subpt. P, app. 1 at § 12.04C.

With regard to Bowers' "paragraph C" criteria, the ALJ found:

> The undersigned has also considered whether the "paragraph C" criteria
> are satisfied.  In this case, the evidence fails to establish the presence of
> the "paragraph C" criteria.  There is no evidence of a history of a chronic
> affective disorder of at least two years' duration that has caused more than
> a minimal limitation of ability to do basic work activities, with symptoms
> or signs currently attenuated by medication or psychosocial support, and
> either repeated episodes of decompensation, each of extended duration; or
> a residual disease process that has resulted in such marginal adjustment

---

[12] The limitations identified in assessing paragraph B or C criteria are complemented by an RFC
finding, and by consideration of more detailed work-related capacities that may be affected by
mental disorders.  20 C.F.R. § 404, subpt P, app 1 at § 12.00A.

> that even a minimal increase in mental demands or change in the
> environment would be predicted to cause the individual to decompensate;
> or a current history of one or more years' inability to function outside a
> highly supportive living arrangement, with an indication of continued need
> for such an arrangement, as required by listing 12.04.

Bowers argues that this finding is mere "boilerplate," and that the ALJ lacked expert testimony to support his findings.  Insofar as Bowers claims that the ALJ lacked expert testimony, Bowers exaggerates the ALJ's duty to develop the record; an ALJ does not have to retain an expert to scrutinize every piece of evidence that does not happen to have been considered by a physician. Instead, the ALJ bears the duty to weigh all the evidence and "piece together the relevant medical facts" himself.  Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 144 (1st Cir. 1987).  Here, as noted above, the ALJ's findings were based on a review of the entire record, and included every GAF scored and weighed every opinion provided by a treating source.  That the ALJ recited the paragraph C criteria in his ultimate finding does not mean the finding is unsupported, and certainly that is not the case here.

Bowers further contends the state agency opinions that anchored the ALJ's findings lacked evidence about the severe difficulties she had managing the responsibilities of her family. In support, Bowers directs the court to Beyene v. Astrue, 739 F. Supp. 2d 77 (D. Mass. 2010). Her reliance is misplaced.  In Beyene, Judge Young took pains to point out that the hearing officer chose not to base his decision on the expert testimony, but instead, on his own assessment of Beyene's treatment notes, her GAF, and testimony.  Id. at 83.[13]  Cf. Tremblay v. Sec'y of Health & Human Servs., 676 F.2d 11, 13 (1st Cir. 1982) (affirming the Secretary's adoption of the findings of a non- testifying, non-examining physician and permitting those findings by

---

[13]   Further, Judge Young repeated the general rule that the claimant's capacity may even be assessed without regard to expert testimony so long as the hearing officer's decision is based on evidence that would suggest to a lay person that a claimant's impairments are mild and pose no significant functional restrictions.  Id.

themselves to constitute substantial evidence in the face of a treating physician's conclusory statement of disability).  In contrast, here, rather than substituting his own opinion for those of experts, the ALJ relied on expert opinions, according "great weight" to the opinions of the reviewing state agency psychological consultant Dr. Derecho and the psychiatric consultant B. Rudnick (Tr. 37), both of whom opined that the evidence did not establish the presence of the "C" criteria (Tr. 301, 337).  In addition to the expert testimony, the ALJ also supported his RFC determination with specific facts.  The ALJ acknowledged that Bowers' children were in foster care, but he cited to or acknowledged multiple treating sources who expressly noted that Bowers could care for them.  (Tr. 37).  The ALJ also considered Bowers' visits to various health workers reflecting her symptoms, observations, and diagnoses, and the ALJ noted the testimony of Bowers and her mother to the effect that Bowers had demonstrated ability to care for her children.  (Tr. 31).  The record reflects the ALJ's awareness of Bowers' home situation, even if those facts may not have been before each state reviewing expert.  The ALJ found the factual record was insufficient to establish "paragraph C" criteria, and Bowers has not carried her burden to show he lacked substantial evidence to make his finding.  Shinseki v. Sanders, 556 U.S. 396 (2009).

     3.  The Vocational Evidence Reflects Bowers' Limitations

     Bowers argues that the vocational expert's testimony is flawed because it is based on what she argues were inaccurate facts as found by the ALJ, specifically the ALJ's presumption that she could sustain productive activity on a regular basis, i.e., for eight hours a day, forty hours a week.  As noted above, the Court rejects this argument.  It finds that the ALJ appreciated that an RFC means an RFC on a sustainable basis, taking into account the limitations of the

claimant.  The ALJ's findings both expressly and implicitly capture these considerations.  The

ALJ accurately captured Bowers' limitations when he asked the vocational expert to:

> Assume we have an individual with the same age, educational background
> and past work experience as the claimant.  Further assume the individual
> retains a (RFC) for work with the following additional limitations.  She
> would be limited to unskilled tasks, there would be minimal interaction
> with the general public, minimal contact or interaction with co-workers.

(Tr. 69).  The constraints described in the hypothetical match those as found by the ALJ in his

assessment of Bowers, and as such, are proper.  Aho v. Comm'r of Soc. Sec., 2011 WL 3511518

* 8 (D. Mass. 2011) (answers to hypothetical questions constitute relevant evidence if the

premises are supported by substantial evidence in the record.).

## Conclusion

For the foregoing reasons, this Court recommends to the District Judge that Plaintiff''s

Motion for Remand (Docket #11) be DENIED, and Defendant's Motion for an Order Affirming

the Decision of the Commissioner (Docket #16) be GRANTED.[14]


So ordered.

> */s/ David H. Hennessy*
> David H. Hennessy
> United States Magistrate Judge

---

[14]   The parties are hereby advised that, under the provisions of Federal Rule of Civil Procedure
72, any party who objects to these proposed findings and recommendations must file specific
written objections thereto with the Clerk of this Court within fourteen days of the party's receipt
of this Report and Recommendation.  The written objections must specifically identify the
portion of the proposed findings, recommendations, or report to which objections are made and
the basis for such objections.  The parties are further advised that the United States Court of
Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will
preclude further appellate review of the District Court's order based on this Report and
Recommendation.  See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275 (1st Cir.
1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986); United States v.
Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d
603, 604-05 (1st Cir. 1980); see also Thomas v. Arn, 474 U.S. 140 (1985).